MCPHERSON v. BRISTOL.

1. PARTNERSHIP—NONTRADING FIRM—COMMERCIAL PAPER.
   One partner in a nontrading partnership cannot bind his copartners by a note given by him in the firm name, although for a debt due from the firm, unless he has express authority from his copartners, or the giving of such note is necessary to carry on the firm business, or is usual in similar partnerships; and any liability founded upon a holding out of the partnership relation is necessarily limited by this rule.

2. SAME—ERRONEOUS INSTRUCTIONS.
   A correct instruction as to the liability of a member of a nontrading firm with respect to commercial paper executed by his copartner will not cure the error of the circuit judge in ignoring, in the charge as a whole, the distinction between trading and nontrading firms.

Error to Livingston; Smith, J. Submitted October 8, 1897. Decided December 15, 1897.

*Assumpsit* by William McPherson, Jr., and Alexander McPherson, against John Bristol, impleaded with J. S. Day, upon a promissory note. From a judgment for plaintiffs, defendant brings error. Reversed.

*William P. Van Winkle* and *W. E. Scott*, for appellant.

*Louis E. Howlett* and *Judd Yelland*, for appellees.

MONTGOMERY, J. This action is based upon a promissory note made to one C. L. Cook or bearer, and signed by J. S. Day and John Bristol. The defendant Bristol denied the execution of the note under oath, and the question of his liability depends upon the question of whether he and Day were partners, and whether Day had authority to bind him by giving the note in question. The facts seem to be that in 1895 the two defendants joined in the lease of

a fruit farm, and engaged in the business of raising fruit. The lease was for one year, with the privilege of three. Day went to live on the farm, and Bristol lived on a farm of his own near by. They did not own teams or tools jointly. Bristol supplied whatever tools or teams he used, and Day did the same, up to about the time of the making of the note in question. There is some evidence tending to show that a foreman was employed, and during the summer of 1896 so-called "checks" were issued to the pickers of the fruit, stating the number of quarts picked each day, in the name of Day & Bristol. The fruit packages were stamped "Day & Bristol," but sales of the fruit were generally made in the names of the individual parties. There is some slight evidence tending to show that, in addition to the business of raising and shipping berries, the parties bought and sold fruit; that is, by the testimony it appears that Day bought a quantity of huckleberries to sell with his other fruit, and, by the testimony of one witness, it would appear that Bristol had knowledge of this fact, and there is possibly enough to have permitted the jury to draw the inference that it was a part of the business of the firm.

On the 24th of June, 1896, the note in question was given, the consideration being a horse at $125, and $25 in money. There is no evidence that Bristol authorized the giving of this note. One witness testifies that she overheard a conversation between Day and Bristol, in which Day stated that it would be necessary to buy a horse, and Bristol replied that, if they bought a horse, it should be a good one, so that they could sell it again. This is denied by the defendant Bristol. There is also testimony of some statements of Bristol which were brought home to the knowledge of Cook, the payee in the note, to the effect that he (Bristol) and Day were in partnership in the fruit business.

It will be seen that, upon this state of the evidence, the questions presented were:

1. Was there a partnership in fact?

2. If there was no partnership in fact, was there such a holding out to the world as to justify those dealing with the members in believing that such a partnership existed?

3. If there was a partnership in fact, was it a trading or nontrading partnership?

4. If there was such a holding out, was it a holding out of the firm which justified strangers in believing that authority existed to execute the note in question?

The distinction between nontrading firms and commercial partnerships is well recognized in the law, although this court, so far as we have been able to ascertain, has never had occasion to discuss the matter at any length. In nontrading firms one partner does not generally possess the power to bind the partnership by way of contracting debts and executing commercial paper. In the case of such partnerships it must affirmatively appear that the partner had the power to make the contract in question. The power to make commercial paper by a member of a nontrading firm exists only when it is expressly conferred, or when the giving of the paper is necessary to carry into effect an original purpose for which the partnership was formed. See 17 Am. & Eng. Enc. Law, 994, 1008, 1018, 1026.

The case of *Smith* v. *Sloan*, 37 Wis. 285 (19 Am. Rep. 757), is an instructive case on this point, and contains a careful review of the American and English authorities; and the conclusion reached is that a partner in a nontrading partnership cannot bind his copartner on a bill or note drawn, accepted, or indorsed by him in the name of the firm, not even for a debt which the firm owes, unless he has express authority from his copartner, or unless the giving of such instrument is necessary to carry on the firm business, or is usual in similar partnerships, and that the burden is upon the holder of the note who sues upon it to prove such authority, necessity, or usage. The learned circuit judge, in his charge, recognized this rule, and charged the jury that in noncommercial partnerships, in order to hold the firm, it must be affirmatively estab-

lished that the partner had power to make the contract in question, and, further, that in nontrading partnerships one partner has no implied power to bind the other partner; but, in another part of his charge, the circuit judge charged the jury as follows:

"Now, in this case there are two theories upon which this defendant can be held liable. One is that, as a matter of fact, at the time of the execution of this note in question, on the 24th day of June, 1896, Mr. Day and Mr. Bristol, the defendants, were actually and in fact copartners, and so understood by themselves and between themselves that they were such copartners; that each of them contributed either capital or labor, credit, or skill and care, or two or more of these; and that all the contributions were put together in a common stock or a common enterprise, to be used for the purpose of carrying on business for a common benefit. If, as a matter of fact, at that time such a partnership existed, then Mr. Bristol would be liable on this note. Day would have authority to sign and execute it, and bind him, and it would not be important whether it was held out to the world that they were partners or not; or whether Mr. Cook knew it or not. That is one theory. The other theory of recovery is that Mr. Bristol had permitted Mr. Day, or done such acts himself, or knowingly or understandingly permitted it to be held out to the world that *himself and Day were partners*, and that knowledge of that fact had come home to Mr. Cook in taking this note; even though it turns out *in truth and in fact that they were not partners*, yet Mr. Bristol would now be estopped from showing a lack of partnership between them, and he could not escape the payment of any indebtedness as contracted by this note given between them and Cook.

"I say, then, there are two theories in this case. A partnership in fact may be formed, and can only exist as between the parties themselves, in pursuance of an express or an implied agreement, to which the minds of the parties have assented. The intention or even belief of one party alone cannot create a partnership without the assent of the others. That is a partnership in fact that I refer to now. But, as to third persons, parties may so conduct themselves as to be liable to third persons as partners, when in fact no partnership exists as between themselves. I now refer to commercial partnerships, and not to non-

trading partnerships. The public are often called to judge by appearances and actions, and are not bound to any real facts. Parties might be copartners as to third persons, and brought within the liability of partners as to third persons,—I mean commercial partners,—who are not partners as between themselves, yet they will be so regarded as to third persons if they voluntarily and knowingly so conduct themselves as to reasonably justify the public or persons dealing with them in believing they are partners.

"There has been some evidence offered here in relation to the general notoriety of the copartnership; that is, the general report and common understanding in the village of Howell, where Mr. Cook lives. Now, you cannot consider that evidence at all in determining whether there was an actual partnership existing between these parties. An actual partnership, or partnership in fact, cannot be proven in that way; but you can only consider such common report and general understanding as bearing on the question of whether Mr. Cook was warranted in believing from the acts of Bristol, through Day, or on his own account,—reasonable belief, I mean,—that there was a copartnership existing. If a person voluntarily and knowingly holds himself out by his acts or language, to the public or to third persons, as a partner of another, and if any third person deals with that other because of belief in an existing partnership, then the person so holding himself out will be liable as a partner to the person so dealing, notwithstanding, in fact, there was no such partnership.

"If you believe from the evidence that prior and up to the time the note introduced in evidence in this case was given, the 24th of June, 1896, Mr. Bristol voluntarily and knowingly allowed and permitted the business of the firm of Day & Bristol to be conducted in such a way as to justify the public in general, and Mr. Cook in particular, and persons dealing with the firm, in supposing and believing that Mr. Bristol was a member of the firm; and that Mr. Cook, before and at the time he sold the goods (the horse), lent him money, and took the note in question, was *led to believe, and did believe, from the manner in which the business was conducted, that Mr. Bristol was a member of the firm,—then plaintiffs will have a right to hold* Bristol liable for the note as a member of the firm; and in such a case it is immaterial whether Bristol made representations personally to Mr. Cook that

he was a member of the firm or not. I apprehend that the underlying principle of that rule is this: That, where one of two parties must suffer a wrong, the law throws the burden of the suffering upon him who had it in his power to prevent the wrong, and failed to do so."

It is probable that the circuit judge intended these instructions to be limited by the other instructions relating to the liability of partners in nontrading firms; but we think the language was not sufficiently guarded. All the conditions named in the instruction of the court as requisite to constitute a partnership, viz., the contribution of capital or labor to the common enterprise, might concur in a nontrading partnership as well as in a trading firm; and the instruction, "If such a firm existed at the time the note was given, Mr. Bristol would be liable," is entirely too broad. Furthermore, as appeared by the facts of this case, the instruction as to the holding out should be qualified. While there is evidence tending to show that it was held out to the community that Day and Bristol were partners, and while the evidence would indicate that they were partners in fact, neither would justify the instruction that Day had the right to give the note in question, and bind Bristol. This nullifies and ignores the distinction between a commercial and a nontrading partnership. If a nontrading firm is not *prima facie* liable upon a note given by one of its members, it is clear that the bare fact that the members of the association permit it to be understood that it is a nontrading partnership does not justify a person dealing with the firm to infer an authority to execute commercial paper.

The other questions presented in the record are not likely to arise on a new trial, and we pass them by with the suggestion that in some instances the witness Griffith was permitted to testify to inferences rather than facts, which error can be corrected on a new trial.

Judgment will be reversed, with costs, and a new trial ordered.

The other Justices concurred.